# UNITED STATES DISTRICT COURT

NORTHERN _____ DISTRICT OF ___ ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

LOUIS BURNS

**F I L E D**

MAY 2 1 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNDER SEAL

**CRIMINAL COMPLAINT**

MAGISTRATE JUDGE ASHMAN
CASE NUMBER:

**08CR          402**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

Between on or about July 10, 2007 and on or about August 7, 2007, in Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant, Louis Burns, being an agent of the City of Chicago, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, namely $150 and $250 cash, intending to be influenced or rewarded in connection with any business, transaction, and series of transactions of the City of Chicago, involving anything of value of $5,000 or more, the City of Chicago being a local government that received in excess of $10,000 in federal funding in a twelve month period from August 7, 2006, through August 7, 2007;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

I further state that I am a Special Agent, United States Postal Inspection Service, and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof:  __X__ Yes      _____ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

May 21, 2008
Date

at  Chicago, Illinois
City and State

Hon. Martin Ashman, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, David B. Hodapp, being duly sworn under oath, depose and state as follows:

### I.    BACKGROUND OF AFFIANT

1.    I am a Postal Inspector with the United States Postal Inspection Service and have been so employed since September 1987. In connection with my official duties, I have investigated violations of federal criminal law, including violations relating to public officials. I have received training and participated in all normal methods of investigation, including, but not limited to, visual and electronic surveillance, the general questioning of witnesses, the use if informants, and undercover operations. I have also received training in the enforcement of laws concerning, among other things, public corruption and white-collar crime.

### II.    PURPOSE OF AFFIDAVIT

2.    This affidavit is made for the limited purpose of establishing probable cause in support of a criminal complaint charging LOUIS BURNS with violation of Title 18, United States Code, Section 666(a)(1)(B), charging that between on or about July 10, 2007 and on or about August 7, 2007, BURNS, being an agent of the City of Chicago, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, and series of transactions of the City of Chicago, involving anything of value of $5000 or more, the City of Chicago being a local government that received in excess of $10,000 in federal funding in a twelve month period from August 7, 2006 through August 7, 2007.

3.      More specifically, in 2007, BURNS worked as a City of Chicago clerk in the Department of Construction and Permits. As more fully described below, on July 11, 2007 and August 7, 2007, BURNS accepted a $250 cash bribe and a $150 cash bribe respectively from a cooperating witness (CW1) believing that CW1 had collected the cash bribes from developers paying the bribes in exchange for BURNS facilitating the expedited review of plans in order to obtain a building permit more expeditiously than otherwise available for a property located at 1332 North Milwaukee.

4.      This investigation has been jointly conducted by the United States Postal Inspection Service ("USPIS"), the City of Chicago Office of Inspector General and the Federal Bureau of Investigation. The information contained in this Affidavit is based on my personal knowledge as well as information obtained from other law enforcement agents participating in the investigation, cooperating witnesses, documents, and recorded conversations. Since this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that BURNS committed a violation of 18 U.S.C. § 666.

## III.    EXPLANATION OF THE BUILDING PERMIT PROCESS AND CITY DEPARTMENTS

5.      The process for issuing building permits and monitoring construction projects is governed by several departments within the City of Chicago, including the Department of Zoning ("Zoning"), the Department of Construction and Permits

("DCAP"), the Department of Buildings ("Buildings") and the Department of Administrative Hearings ("AH").

6.     The principal role of Zoning is to enforce Chicago's Zoning Ordinance, to implement the city's land use policies and to maintain and update the city's official zoning maps. Developers seeking to obtain a building permit for new construction and renovation projects which require architecture plans receive an initial review of their architectural plans in Zoning to assure that the project conforms to the official zoning and land use policies of the City of Chicago. Zoning reviews the survey plats, parking lot layouts and site plans to ensure that projects conform to the Zoning Ordinance. When a proposed development is not in compliance with the Zoning Ordinance or permitted use, a developer has the option of seeking an administrative adjustment or a zoning variance. The administrative adjustment process is a streamlined procedure for minor modifications of selected zoning standards. The zoning variance procedures involve review and approval of the requested changes by the Zoning Board of Appeals. Zoning is also responsible for administering the landscape ordinance within the zoning code which governs landscaping of all business, commercial and large residential projects. In addition, zoning is responsible for issuing Certificates of Occupancy (a certificate from the City certifying that a structure is fit for human habitation) for construction projects containing between one to three dwelling units and for issuing Zoning Compliance Certificates (a certificate from the City certifying that a structure meets the applicable zoning requirements) for the occupancy, use, or change of use of any property in the city. Projects receive an initial review in Zoning by a zoning plan examiner ("ZPE"). On-site investigation of projects to ensure compliance with the Zoning Ordinance, including the

landscape ordinance, and Certificate of Occupancy reviews are performed by zoning inspectors.

7.    DCAP is responsible for issuing construction permits.  Prior to the creation of DCAP in April 2003, construction permits were issued by Buildings.  A permit application must include the names and City license numbers of the general contractor and each subcontractor who intends to work on the construction project.  To obtain a general contractor's license from the City, an applicant must mail a license application to an address maintained by the Department of Buildings.  License applications must be renewed by mail every year.  Generally, the construction permit application process follows one of three different tracks: the Easy Permit Process ("EPP"), Standard Review Plan process, or Developer Services process.  EPP is used to obtain construction permits for repair or replacement of existing elements of a building, when no structural changes to the building will be made.  Standard Review Plan (also referred to as Open Plan Review) is used to obtain construction permits for small to mid-sized construction and renovation projects requiring architectural drawings.  The Standard Review Plan process involves an initial assessment of a construction project by a DCAP project manager.  After the project manager review, the architectural plans receive technical reviews of appropriate disciplines which include, among others, electrical, plumbing, ventilation, structural, architectural, landscape and fire prevention. The purpose of each discipline review is to ensure that the proposed project is in conformance with the building codes and regulations of the City of Chicago.  The Developer Services process is used to obtain construction permits for large and complex projects.  In January 2008, DCAP merged back into the Buildings Department.

8.    Buildings is responsible for the enforcement of the Chicago Building Code governing the construction, rehabilitation and maintenance of structures within the City of Chicago. Within Buildings is the New Construction Bureau. New construction inspectors' primary role is to perform inspections to ensure that construction and renovation work conforms to the permits that have been issued by DCAP. Building inspectors can also respond to complaints regarding structures, including emergencies that occur after working hours, and they can issue violation notices to building owners when a structure is not in conformance with the Building Code. Inspections can also be generated by the public by dialing 311, the non-emergency number for city services. Inspectors can also issue "stop work orders" to stop any construction that is done without a permit, contrary to an approved permit, and other forms of construction that poses a threat to the health and safety of the public. A stop work order is a directive from the Department of Buildings, addressed to the owner of property on which construction or demolition work is proceeding without proper authorization. The stop work order prohibits further work, and in some cases requests the removal of work already completed, until or unless an appropriate construction permit has been obtained. There are different procedures for releasing each kind of stop work order, which can include paying fines and/or paying additional permit fees. Some releases can occur at the City's satellite offices (additional offices located in various neighborhoods for the convenience of property owners and developers), while others involve the applicant presenting the plans and application to the DCAP or to another Department, usually at City Hall. Inspectors sign the back of a contractor's construction permit when an inspection is performed and the inspector determines that the completed work is within the

requirements of the Building Code and the scope of the construction permit. Certificates of Occupancy for construction and renovation projects involving four or more units are also issued by Buildings. Building Inspectors conduct inspections of projects prior to the issuance of Certificates of Occupancy. Finally, Buildings has historically maintained a mainframe computer database that contains information about buildings in the City of Chicago, including the number of original units in each building.

9.     AH serves as a quasi-judicial tribunal for the expedient, independent and impartial adjudication of municipal ordinance violations. AH has several divisions, including a Building Division. The purpose of the Building Division is to adjudicate cases initiated by the Buildings, Fire and Zoning departments.

10.     Contractors, developers, and homeowners may hire a permit expediter to facilitate the construction permit application process. The services performed by a permit expediter include, among other things: completing construction permit application forms; collecting and submitting relevant documents to DCAP and Zoning; waiting in line at City Hall for plan reviews; scheduling building inspections; meeting with architects, contractors, developers, homeowners, City of Chicago inspectors and other City of Chicago officials; resolving building code violations; and obtaining Certificates of Occupancy. City of Chicago employees are prohibited from acting as permit expediters.

11.     Obtaining timely reviews, approvals, and permits is important to developers. Waiting for a lengthy period of time for a review, failing to pass an inspection, or the issuance of a stop work order can have significant financial consequences for developers. These circumstances can preclude developers from starting

6

or completing the work that needs to be done on a project (thereby lengthening the period of time for a project which may add costs or at least delay the time at which a developer can recoup capital tied up in a project), or require developers to do additional work on a project (thereby increasing the cost of the project.)  For example, as described in detail below, BURNS accepted bribe payments in exchange for facilitating a review of plans in DCAP on an expedited basis not otherwise available in connection with architectural plans for a property located at 1332 North Milwaukee, thereby allowing the developer to obtain a building permit on that project more expeditiously.

## IV.    THE INVESTIGATION

12.    This phase of the criminal investigation began in April 2007, when investigators obtained information concerning a shakedown scheme involving certain individuals, including a particular "expediter," who assisted contractors and developers in the permit application process. Specifically, evidence indicated that a certain building inspector was posting stop work orders on properties and agreeing to lift the order only if the property's owner used this particular expediter.  In May 2007, law enforcement agents interviewed the expediter (hereinafter referred to as CW1).[1]

---

[1] CW1 has not been charged with any crime.  CW1 understands that he/she will be charged with a violation of federal criminal law.  No promises have been made regarding what charges will be brought or what sentence CW1 will receive.  CW1 is cooperating with the government in the hopes of receiving a benefit in the determination of what charges will be brought and what sentence will be recommended by the government.  CW1 has no previous arrests or convictions.  Investigators believe CW1 to be reliable.  Although CW1 lied to agents during the initial interview about the nature and scope of CW1's relationship with City employees, CW1 has subsequently spoken with investigators numerous times under proffer protection, and is believed to have provided truthful information.  CW1 has provided information about bribery activities by over thirty individuals.  This information has been corroborated for a number of those individuals by recorded conversations and/or controlled bribe payments.

13.    CW1 admitted to paying bribes to City employees for a variety of actions, non-actions, favorable reports or to facilitate a quicker-than-normal inspection or review from approximately 2001 through May 2007. CW1 also admitted to CW1's role in accepting bribes from developers and contractors, which CW1 would pass on to City employees.

14.    CW1 began actively cooperating with the government in May 2007. CW1's cooperation has included conducting consensually recorded calls and meetings, as well as playing the role of "bagman" (collecting bribe money from developers and contractors seeking some official act from a City employee or a "priority" handling of a project and paying the bribes to City of Chicago employees).[2]

15.    CW1 has advised law enforcement that it was the practice of developers and contractors with whom CW1 has worked to express a willingness to bribe a City official for actions typically by using coded language, such as "do whatever it takes" (to get an action accomplished). CW1 would also use coded language by asking a developer or contractor if CW1 has a "budget" to work with or if this action is a "priority." CW1

---

[2]
On June 1, 2007, CW1 entered into a consent agreement with the USPIS to allow the government to autorecord all communications transmitted or received on CW1's cellular telephone in which CW1 participated (including voicemail messages left for CW1). This agreement allowed CW1 to make and receive calls during the course of this investigation outside of the presence of a Postal Inspector and to conduct CW1's business as an expediter. Under the agreement, CW1 was not allowed to let anyone other than CW1 use the cellular telephone and CW1 was also limited to using the cellular telephone for conducting business as an expediter. All calls were recorded. CW1 had no control over the autorecord and could not manipulate whether a call was recorded or not. Pursuant to court orders issued approximately every thirty or sixty days, beginning on June 4, 2007 and continuing to March 28, 2008, (with the exception of a period of time in January 2008 during which the autorecord was not renewed) signed by either the Chief Judge or Acting Chief Judge, all calls sent or received from CW1's cellular telephone for a period of thirty or sixty days were recorded using the same technology employed in a Title III wiretap but without the requirement of contemporaneous monitoring by law enforcement agents.

would also use coded language in communicating with the City official, by saying, for example, that an "incentive" is available. In other instances, City officials would solicit bribe payments from CW1 initially, and CW1 would then communicate this to the developer or contractor. The developer or contractor would then pay CW1 for expediting services in addition to the amount of any bribes that CW1 was to pay to City officials.

16.    According to CW1, developers and contractors will pay bribes to employees in Zoning for: a) overlooking violations of the Zoning Ordinance; b) increasing the reported number of existing dwelling units in a building being rehabbed to avoid a costly and time-consuming zoning variance process; c) providing a favorable or expedited inspection for a Certificate of Occupancy; and d) expediting a Zoning Compliance Certificate faster than the normal process. CW1 has admitted to paying bribes to zoning inspectors for these actions.

17.    CW1 has told investigators that developers and contractors will pay bribes to DCAP employees for: a) speeding up the Standard Plan Review process; and b) obtaining quicker review appointments. CW1 has admitted to paying bribes to certain clerical employees and technical reviewers in DCAP for these actions.

18.    CW1 has told investigators that developers and contractors will pay bribes to Buildings employees for: a) overlooking construction work which does not conform to City building codes; b) overlooking work performed beyond the scope of a construction permit; c) removing building code violations; d) lifting stop work orders; e) signing off on construction permits without performing an inspection; f) providing favorable or expedited inspections for a Certificate of Occupancy; and g) changing information in the

City's mainframe computer system. CW1 has admitted to paying bribes to inspectors in Buildings for these actions.

19.    CW1 has told investigators that developers and contractors will pay bribes to AH employees for: a) expediting the AH process, and b) negotiating a settlement. CW1 has admitted to paying bribes to Buildings employees assigned to AH to facilitate adjudication of Buildings cases in AH in a manner favorable to CW1's clients.

V.    **PROBABLE CAUSE**[3]

20.    According to City of Chicago personnel records, LOUIS BURNS has been employed by the City of Chicago since May of 2005 and currently holds the position of Clerk II in the Department of Buildings. In 2007, prior to the January 2008 merger of DCAP into the Department of Buildings, BURNS held that same position with DCAP.

*__Historical Bribe Payment Information From CW1__*

21.    According to CW1, CW1 has paid bribes in the past to BURNS, typically $100 to $200, to obtain more expeditious reviews of architectural plans through the DCAP Standard Plan Review process than would otherwise be available, although CW1 cannot remember the details of the specific bribes paid. CW1 also recalled that, sometime in the summer of 2006, CW1 paid BURNS between $200 and $300 in exchange for his ensuring that architectural drawings moved through the DCAP review process in an expedited manner. CW1 cannot remember precisely when that bribe payment happened or the property involved.

---

[3] Throughout this Affidavit, I describe various conversations that were consensually recorded. All times listed are approximate. The summaries of the recorded conversations set forth in this Affidavit are based on draft – not final – transcriptions. Finally, the summaries below do not include all potentially criminal consensually recorded conversations, or all statements or topics covered during the course of the conversations.

**_Controlled Bribe Payment Pertaining to 1332 North Milwaukee Avenue_**

22.    On July 10, 2007, at approximately 1:05 p.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, CW1 asked BURNS to move the building plans for 1332 North Milwaukee Avenue more expeditiously through the DCAP review process.[4] CW1 told BURNS, "Ok, I'm gonna see you tomorrow. I wanted to give you this application number, can you get it rolling?" CW1 informed BURNS that, "It needs to, uh…, get reviews done A.S.A.P."

23.    On July 11, 2007, at approximately 12:06 p.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, BURNS informed CW1 that he was waiting to talk to a certain individual in the Landmark Department to find out the status of the Milwaukee plans.[5] CW1 told BURNS, "Ok, I'm going to give you a call

---

[4] CW1, acting at the direction of agents, agreed to accept bribe money from the contractor, who agreed to pay bribe money through CW1 in exchange for CW1 securing more expeditious DCAP review of the plans for 1332 North Milwaukee from a DCAP employee, BURNS. As part of the controlled bribe done at the direction of agents, the contractor subsequently paid CW1 the bribe money for the favorable inspection.

[5] The Commission on Chicago Landmarks, also referred as the Landmark Department, reviews all permit applications for work to designated and proposed Chicago Landmarks and for work within designated and proposed Chicago Landmark Districts. The purpose of the Commission's review is to ensure that the proposed work will not adversely affect the significant historical or architectural features of the landmark or landmark district. During the DCAP review process, the Project Manager may inform the customer that the property is a Landmark District. If the property is indeed in a Landmark district, the plans may then be picked up by the Landmark Department for review. After the Landmark Department reviews and approves the architectural plans, the plans are then returned to DCAP and continue through the technical review process.

because I wanted to drop something off to you." CW1 and BURNS agreed to meet a short while later.

24.    On July 11, 2007, at approximately 12:34 p.m., CW1 received a telephone call from BURNS. BURNS left a message on CW1's voicemail. The message was consensually recorded. I have reviewed the recording. BURNS informed CW1 that the Milwaukee plans had corrections from Landmark and they would be calling the applicant to make the corrections before it is returned to DCAP to start the review process. A few minutes later, at approximately 12:37 p.m., CW1 received a telephone call from BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, CW1 informed BURNS that CW1 was waiting for him by the post office in the State of Illinois building.

25.    CW1 met with agents at the briefing location.[6] An audio recording device was placed on CW1. CW1 was also given $250 of prerecorded government funds, to pay BURNS as a bribe payment for pushing the Milwaukee plans more quickly through the DCAP review process. Agents drove CW1 to the meeting location at the State of Illinois building located at 160 North LaSalle Street in Chicago to meet with BURNS. The meeting took place at approximately 12:46 p.m. Although agents drove CW1 to the meet location, due to traffic, agents were not able to take up a surveillance position in time to observe or video record CW1 meet with BURNS. Agents were, however, listening to the meeting in real time.

26.    The meeting was audiorecorded and I have reviewed the recording. During the meeting, BURNS informed CW1 that the plans for the property were with the

------

[6] For this and each controlled bribe meeting described in this affidavit, agents searched CW1's personal effects but not CW1's person or vehicle.

Landmark Department and that the Landmark Department had sent the corrections out to the applicant. BURNS told CW1, "And what they goin' do, they goin' uh, once they address it, that's the only way it will come back" [which CW1 told investigators CW1 understood to mean that the applicant would need to address the corrections before it would come back to DCAP]. CW1 confirmed, "Oh, ok, so they have to do whatever they need to and then it moves on . . . For reviews?" CW1 assured BURNS that CW1 would make sure the owner knew and added, "That's kind of a special project they're really in a hurry for that . . . So I got a good budget to work on that." BURNS responded, "Ok." CW1 asked, "So do, do what you can, LOUIS" and BURNS responded, "Alright." CW1 emphasized, "Ok, I mean there will be doubles, ok" [which CW1 told investigators CW1 meant as a reference to bribe payment]. BURNS responded, "Ok, no problem and another little thing too on this thing you know I ain't goin' be over here that long" [which CW1 told investigators CW1 understood to be referring to the fact that BURNS had been promoted and would be leaving DCAP to move to the Department of Buildings].

27.     CW1 then said, "So I just wanted to give this to you." CW1 later informed agents that at this point in the conversation, CW1 provided the envelope containing $250 bribe payment to BURNS. BURNS responded, "Uh hum, no problem." CW1 and BURNS talked further about BURNS getting moved to the Department of Buildings after his promotion. BURNS assured CW1 that "if they hurry and get that back I have plenty of time." BURNS confirmed that once the architect on the Milwaukee project complied with the Landmark Department's requirements "then it will come back to me."

13

28.     Shortly after the meeting concluded, CW1 was picked up by the agents and driven in the agents' vehicle to a briefing location. CW1 informed agents that CW1 had provided the envelope containing the $250 bribe payment to BURNS.

29.     On July 12, 2007, at approximately 8:59 a.m., at the direction of agents, CW1 called BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, CW1 asked BURNS if the Milwaukee plans had made it to DCAP. BURNS told CW1 that the Landmark Department would not release the Milwaukee plans until the applicant made the corrections. CW1 asked BURNS who CW1 should contact in Landmarks regarding the Milwaukee plans. BURNS provided CW1 with a name and number of a reviewer in Landmarks.

30.     On July 16, 2007, at approximately 8:59 a.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, CW1 informed BURNS that the architect on the Milwaukee property had made the corrections for Landmarks on Friday. CW1 told BURNS that the plans were returned to DCAP. CW1 asked BURNS to locate the plans and have the reviews started. BURNS informed CW1 that the plans were probably still in Landmarks even after the correction and that Landmarks would probably drop off the Milwaukee plans at DCAP that day. He told CW1 that he would call CW1 back once Landmarks dropped off the plans.

31.     On July 17, 2007, at approximately 12:24 p.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, CW1 informed BURNS that CW1's expediting employee had given CW1 an update regarding the Milwaukee plans,

namely that they had been reviewed by the DCAP fire and refrigeration disciplines. BURNS informed CW1 that the plans were currently being reviewed by the DCAP electrical reviewer. CW1 asked BURNS if the other department "reviews will be finished either today or tomorrow?" BURNS informed CW1 that the remaining DCAP disciplines that still needed to review the plans were "accessibility, structural, plumbing." CW1 asked BURNS to "move it along as quick as you can and then we'll touch base tomorrow." BURNS agreed.

32.    On July 18, 2007, at approximately 12:05 p.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, CW1 asked BURNS for an update on the Milwaukee plans, because CW1 had to update the owner. CW1 asked BURNS how many departments were still open on the project. BURNS informed CW1 that architectural review, environmental, accessibility, plumbing, and structural were still open, meaning that the Milwaukee plans had not been reviewed by those disciplines. BURNS told CW1 that environmental would be seen that day.

33.    On July 23, 2007, at approximately 9:15 a.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, CW1 asked BURNS for an update on the Milwaukee plans. BURNS informed CW1, "You ain't got nothing left but accessibility and structural." He further stated that structural would be done that day but that with respect to the accessibility review, BURNS was not at work, explaining that "I got to put it in his hand and all this for them to do it because by me not being there, ain't nobody gonna just move it and do it like that."

34.    On July 25, 2007, at approximately 9:40 a.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, BURNS informed CW1 that the accessibility reviewer was with him reviewing the Milwaukee plans. The following day, at approximately 3:03 p.m., CW1 received a telephone call from BURNS. The telephone call was consensually recorded. I have reviewed the recording. BURNS informed CW1 that the Milwaukee plans were still in accessibility review.

35.    On July 30, 2007, at approximately 1:09 p.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, BURNS explained that the Milwaukee plans were being held up because the reviewer had been off from work, and just got back and had completed his review. BURNS informed CW1 that the structural review was the only thing left for the Milwaukee plans and would be completed by the end of the day.

36.    The next day, at approximately 11:03 a.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, BURNS informed CW1 that he would check with the last reviewer and find out if the Milwaukee plans were ready. BURNS told CW1 that he would call CW1 back once he got upstairs and found out if the plans were ready. About an hour and a half later, at approximately 12:35 p.m., CW1 received a telephone call from BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, BURNS informed CW1 that he could not locate CW1's employee and asked CW1 if it was alright to give the plans to

CW1's employee's nephew, who also worked for CW1. CW1 told BURNS that was fine. BURNS confirmed that the Milwaukee plans had been reviewed by and had corrections from all the review disciplines.

37.    On August 7, 2007, at approximately 11:55 a.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, CW1 and BURNS made arrangements to meet at 12:30 pm at the State of Illinois building.    At approximately 12:45 p.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, CW1 informed BURNS that CW1 was running late for an appointment. CW1 asked BURNS if could come down to meet CW1 on Lake Street to "pick it up"[which CW1 informed investigators CW1 meant as a reference to the bribe payment]. BURNS told CW1 that he was at Lake Street and LaSalle already and CW1 told BURNS that CW1 would be there in ten minutes.

38.    A few minutes later, at approximately 12:49 p.m., at the direction of agents, CW1 made a telephone call to BURNS. The telephone call was consensually recorded. I have reviewed the recording. During the conversation, CW1 informed BURNS that CW1 would be there in three minutes.    CW1 and BURNS made arrangements to meet at the entrance of the Payless Shoe Store on Lake Street.

39.    CW1 met with agents at the briefing location. An audio recording device was placed on CW1. CW1 was given $150 of prerecorded government funds. CW1 drove in CW1's vehicle followed by agents to the meeting location, the entrance to the Payless Shoe Store located at 160 North LaSalle Street in Chicago. At approximately

12:59 p.m., surveillance agents observed and video recorded BURNS meet CW1 outside the shoe store entrance.

40.    The meeting was audio recorded. I have reviewed the recording. CW1 told BURNS, "That's the paperwork from Milwaukee." CW1 later informed agents that at this point in the conversation, CW1 provided the envelope containing a $150 bribe payment to BURNS. BURNS responded, "Oh, ok then. Gotcha." CW1 said, "Ok, thank you, LOUIS." BURNS responded: "Alright then."

41.    Due to the location of the surveillance agents, agents were unable to observe or video record the interaction between CW1 and BURNS during the meeting. After the meeting, CW1 drove in CW1's vehicle followed by agents to a briefing location. CW1 informed agents that during the meeting CW1 handed BURNS the envelope containing the $150 bribe payment for BURNS, which was paid in exchange for BURNS obtaining a more expeditious DCAP review of the plans for 1332 North Milwaukee.

42.    A review of the City of Chicago permit application records disclosed that the contractor's estimate of the value of the work to be performed at 1332 North Milwaukee was $340,000.

43.    A review of City of Chicago records and the City's web site disclosed that the City of Chicago is a unit of local government that received in excess of $10,000 in federal funding in a twelve-month period from August 7, 2006 through August 7, 2007.

44.    Based on the facts described above, I submit that there is probable cause to believe that between on or about July 10, 2007 and on or about August 7, 2007, LOUIS BURNS, being an agent of the City of Chicago, corruptly solicited and demanded

for the benefit of any person, and accepted and agreed to accept, things of value,

intending to be influenced or rewarded in connection with any business, transaction, and

series of transactions of the City of Chicago, involving anything of value of $5,000 or

more, the City of Chicago being a local government that received in excess of $10,000 in

federal funding in a twelve month period from August 7, 2006 to August 7, 2007, in

violation of Title 18, United States Code, Section 666, (a)(1)(B).


David Hodapp
Postal Inspector
United States Postal Inspection Service



Subscribed and sworn to me this
20th day of May, 2008:

Martin C. Ashman
U.S. Magistrate Judge

19